Thomas E. Shuck, Bar No. 116228
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN
A Professional Corporation
515 S. Figueroa St., 8th Floor
Los Angeles, California 90071-3325
tshuck@pmcos.com
Telephone:   (213) 683-6500
Facsimile:   (213) 683-6669

Attorneys for Plaintiff
Hanmi Bank, a California Corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HANMI BANK, a California corporation, | Case No. |
| Plaintiff, | Complaint for Breach of Contract |
| v. | |
| BSB LEASING, INC., a Colorado corporation, | |
| Defendant. | |

Plaintiff Hanmi Bank ("Hanmi" or "Plaintiff"), alleges:

1. Hanmi, is a California corporation and citizen of the State of California with its principal place of business in the City of Irvine, Orange County.

2. Defendant BSB Leasing, Inc. is a Colorado corporation and citizen of the State of Colorado with its principal place of business in the city of Englewood, Arapahoe County, State of Colorado.

3. **Jurisdiction.** This Court has jurisdiction under 28 U.S.C. §1332(a).

4. **Venue.** This case is venued in this judicial district under 28 U.S.C. §1391(a)(1),

(2), (3) and in the Southern Division pursuant to 28 U.S.C. §84(c)(2), and also under the Parties' contract, **Exhibit "1"**.

## CLAIM FOR RELIEF

### ( Breach of Contract)

5. Through its Commercial Equipment Leasing Division, Hanmi originates commercial equipment leases and finance contracts through a national network of equipment vendors and third-party originators.

6. On July 13, 2015, Hanmi's predecessor in interest, Banc of California, N.A, entered into an Originator Program Agreement ("Agreement") with BSB under which BSB submitted equipment lease transactions to Banc of California for possible acquisition. The Agreement is attached as **Exhibit "1"**.

7. On October 27, 2016, Hanmi succeeded to all right title and interest in the Agreement and all equipment lease transactions acquired thereunder from Banc of California when Hanmi purchased the former's Commercial Equipment Finance Division.

8. As "Originator" BSB made certain warranties and representations to Hanmi under §5 of the Agreement about each lease transaction BSB offered for purchase, including but not limited to the following, in relevant part:

**5 Warranties and Representations:**

With respect to each and every financing transaction submitted by Originator to the Bank, Originator expressly warrants and represents:

A) All executed documents submitted to the Bank by Originator will have been duly authorized, executed and delivered by all parties thereto including, but not limited to Originator, *any lessee*, debtor, obligor, *guarantor*, pledgor, *supplier or vendor* and **will be in full force and effect and will be valid, authentic, and binding upon and enforceable against the respective parties thereto in accordance with its terms.** As to each proposed financing transaction no event has occurred and/or is continuing which constitutes a default thereunder by any party thereto or would constitute a default but for the requirement that notice be given or lapse of time or both. **[Emphasis added]**.

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

4895-6495-9070.2

- 2 -
COMPLAINT

B) Each copy of the documents submitted to the Bank by Originator will be, at the time submitted or delivered and at the time designated hereunder, a true and complete copy of all documents constituting each financing transaction as in effect on each such date.

C) For each lease, Originator warrants good and marketable title to each item of leased equipment free and clear of any liens or encumbrances created by or arising through Originator and any lessee. . . For each loan secured by equipment, Originator warrants and represents that the Bank will have a first priority purchase money lien on equipment.

D) Unless otherwise disclosed in writing, any financing transaction shall not be the subject of a sale leaseback transaction.

E) Unless otherwise disclosed in writing all equipment to be leased. . . under a purchase money security interest shall be new and not used and is being acquired in connection with the financing transaction submitted to the Bank.

9. During 2020 and 2021, BSB originated approximately 17 Equipment Finance Agreements ("EFAs") with small "mom and pop" restaurant owners, retailers or wholesalers -- called "customers" in the EFAs-- through a purported "point of sale" equipment vendor called "J & E Business Consulting". BSB then pitched and sold each of the 17 EFAs to Hanmi under the Agreement ("J&E Portfolio").

10. Hanmi performed all conditions required of it under the Agreement except those excused by BSB's breaches as outlined below.

11. Beginning in mid-2022, Hanmi began to learn through investigative work by Orion First, its servicing agent that BSB breached the Agreement when it sold each EFA in the J&E Portfolio to Hanmi in the following among other ways:

(A) The purported "customers'" never saw, and of course never signed, any component of the BSB originated EFAs including guarantees and equipment acceptance certificates. Instead, BSB arranged for or allowed J&E to arrange for and forge the "customer" and "guarantor" signatures on the various documents. **Note:** The fact that each of the 17 EFAs is unenforceable for lack of customer consent or authorization to contract is sufficient without further discussion to require that BSB repurchase under §5(A) of the Agreement cited **above**. The

- 3 -
COMPLAINT

4895-6495-9070.2

additional components of the broader scheme discussed next, aggravate this essential breach, but are unnecessary to require repurchase.

(B) Rather than present, explain, gain consent to, and obtain the "customer's" signatures on the EFAs, BSB's purported vendor J&E never revealed the EFAs. Instead, J&E had each "customer" separately and secretly sign a crude "Software-As-A-Service" Agreement ("SAAS") for J&E's own internet search engine optimization marketing program, through which the customers of the "customer" could also place on-line orders on the "customer's" website. Most or all of the ersatz BSB "customers" were also existing J&E accounts. In some or all the EFAs, J&E- made "working capital" loans or similar advances using Hanmi's money.

(C) J&E linked its marketing services to the "customer's" *pre-existing* equipment. In a few situations, J&E delivered a piece or two of equipment to supplement what the "customer" already had on site. But not one piece of the "point of sale" equipment described in the J&E/ BSB invoices that Hanmi funded appears to have ever been delivered. Nor of course did the "customers" expect that any equipment would be delivered. In that sense, the transactions had the features of sales and leasebacks prohibited under §K of the Agreement, **above.** The equipment and serial numbers in the BSB invoices are certainly complete fabrications, and possibly were used to double finance other phony contacts in the J&E Portfolio or elsewhere.

(D) The purported vendor J&E drew ACH payments from the "customer" using J&E's secret SAAS agreement that named a fictitious servicer called "Tandem Financial, Inc".

(E) It appears none of the "customers" made payments to Hanmi through Hanmi's servicing agent Orion. Instead, they made payments to J&E, which then made the payments to Hanmi Orion via ACH under the "customer's" name until J&E ran out of Hanmi's money and the Ponzi scheme began to collapse in the fall of 2022.

12. The Agreement provides at §11, in relevant part:

**Remedies for Breach**:

In the event of a breach of any of the representations and warranties set forth in paragraph 5, above, Originator, within five-(5) business days of receipt of the Bank's written demand, shall purchase the identified financing transaction(s) from the Bank for a sum equal to the past due

- 4 -
COMPLAINT

4895-6495-9070.2

amounts, including taxes, late charges, and all other fees costs , plus the outstanding remaining payments and any residual value of the equipment in the case of a lease, discounted at a rate of five percent (5%).

13. The repurchase amount under §11 is **$735,825.68 plus** interest, according to final proof. Hanmi demanded in accordance with the procedures above, that BSB repurchase this amount. Hanmi also offered to concurrently reassign all its rights in the purported EFAs to BSB so that BSB could attempt to recover the money it owes to Hanmi from J&E or other third parties. BSB refused to honor it repurchase obligations under the Agreement.

14. Under §17 of the Agreement, Hanmi is entitled to legal fees and costs it incurs in pursuing BSB for its breaches.

WHEREFORE, Hanmi prays for judgment against BSB, as follows:

1. For the principal sum of **$735,825.68** together with interest thereon at the legal rate;

2. For legal fees and costs of suit; and

3. For such other and further relief as the Court may deem just and proper.

DATED: April 20, 2023

PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN
A Professional Corporation

By: /s/Thomas E. Shuck
THOMAS E. SHUCK
Attorneys for Plaintiff
HANMI BANK

- 5 -
COMPLAINT

4895-6495-9070.2

# EXHIBIT 1

# ORIGINATOR DISCOUNT PROGRAM AGREEMENT

This Originator Program Agreement ("Agreement") is made this 13 day of July, 2015 by and between Banc of California, N.A. ("Bank") and BSB Leasing, Inc. (hereinafter "Originator"). Originator and Bank are hereinafter referred to as "the parties".

WHEREAS, Originator proposes from time to time to submit leases, equipment finance agreements, promissory notes, loan agreements, conditional sale contracts, installment sales contracts, chattel paper, or other transactions to Bank (hereinafter referred to as a "financing transaction" or "financing transactions") to Bank; and whereas, Bank proposes from time to time to acquire such financing transactions from Originator; therefore, in consideration of the premises, it is hereby agreed that the obligations of Originator and the Bank with respect to each and every financing transaction shall be in accordance with and governed by the following terms and conditions:

1.      **Authority of Parties:**
The parties hereto are and shall act as independent business organizations, and as such, shall have no authority to incur obligations or to make any statements or representations on behalf of the other. Further, neither party shall have the authority to accept any payments on behalf of the other. Any payment received by Originator shall be held in trust for the benefit of the Bank. The parties shall not use the name of the other, or any of their respective trademarks as part of the other party's firm, trade, or corporate name, without express prior written authorization. Further, the parties shall not accept service of legal process on behalf of the other party, or employ attorneys to defend against such legal action, or take any legal proceedings in connection with any matter pertaining to the business of the other party except as may otherwise be stated herein. The persons executing this Agreement warrant and represent that they the authority to do so and the authority to bind their respective party or parties.

2.      **Banc of California's Discretion:**
The Bank may from time to time, in its sole and absolute discretion, acquire streams of rentals of such financing transactions from Originator. Nothing herein shall require the Bank to acquire any transaction from Originator, and Originator shall not represent or warrant that a financing transaction will be acquired by the Bank prior to the actual acquisition. If the Bank elects not acquire a financing transaction or any new financing transactions from Originator, it shall provide Originator notice of its election and Originator may seek alternate funding sources.

3.      **Documentation:**
All financing transactions shall be documented to the Bank's satisfaction on forms provided by Originator. Originator shall not represent to any person or entity that it is the agent, representative or employee of the Bank and Originator shall not act as agent of the Bank for any purpose absent the express written authorization by the Bank.

4.      **Disclosure of Information:**
Originator shall, in connection with any proposed financing transaction submitted to the Bank, keep the Bank informed of all information known to Originator concerning such financing transaction, including but not limited to the proposed lessee or debtor, the vendor/supplier of equipment, or the equipment or collateral, including any changes occurring or learned following submission of such proposed financing transaction to the Bank.

5.      **Warranties and Representations:**
With respect to each and every financing transaction submitted by Originator to the Bank, Originator expressly warrants and represents:

A)      All executed documents submitted to the Bank by Originator will have been duly authorized, executed and delivered by all parties thereto including, but not limited to Originator, any lessee, debtor, obligor, guarantor, pledgor, supplier or vendor and will be in full force and effect and will be valid, authentic, and binding upon and enforceable against the respective parties thereto in accordance with its terms.

1015430.1

As to each proposed financing transaction no event has occurred and/or is continuing which constitutes a default thereunder by any party thereto or would constitute a default but for the requirement that notice be given or lapse of time or both.

B) Each copy of the documents submitted to the Bank by Originator will be, at the time submitted or delivered and at the time designated hereunder, a true and complete copy of all documents constituting each financing transaction as in effect on each such date.

C) The payment of all sums specified in the financing transaction shall be due and payable on the date or at the time set forth in the financing transaction and shall not be contingent upon the fulfillment or occurrence of any conditions or warranties, either express or implied, except as may be set forth in the lease, and Originator has made no claim or representation that is not specifically set forth in the financing transaction.

D) No part of the money required to commence any financing transaction subject to this Agreement has been loaned, rebated, or advanced by Originator and Originator has not entered into any reciprocal agreements with any lessee, borrower, or officer, director, or guarantor thereof.

E) A lease or other loan request shall not be split between various funding sources unless otherwise disclosed by Originator to the Bank in writing in the original lease or loan proposal.

F) All financial and credit information of a prospective lessee, debtor and/or guarantor has been provided to the Bank, and no negative financial information or ratings have been deleted or concealed from the financial and credit information.

G) For each lease, Originator warrants good and marketable title to each item of leased equipment free and clear of any liens or encumbrances created by or arising through Originator and any lessee and Originator and lessee have not assigned or pledged the whole or any part of its or their rights under such lease or equipment related thereto. For each loan secured by equipment or other collateral, Originator warrants and represents that the Bank will have a first priority purchase money lien on equipment and a first priority lien on all collateral free and clear of any and all liens and encumbrances and that Originator has not pledged or assigned its right, title or interest in the equipment, collateral and the financing transaction. Upon complete satisfaction of the finance transaction, any residual position shall be assigned back to originator as-is, where-is with no warranties whatsoever.

H) Originator has complied with all applicable licensing requirements, including but not limited to obtaining a California Finance Lenders License, or its equivalent.

I) Originator has complied with all applicable entity formation and governance requirements, and is in good standing under the laws of the state of its formation and is duly qualified or licensed to do business as a foreign entity, in good standing, in each other state wherein the conduct of its business or the ownership of its property would require such qualification or licensing or where the failure to be so qualified would have an adverse effect on the enforceability of Originator's rights under any financing transaction. This Agreement is the legal, valid and binding obligation of Originator, enforceable against Originator in accordance with the terms hereof. There is no consent, approval or authorization of, or filing or recording with, any governmental body or agency or of any company or person required to be obtained or made in connection with the execution, delivery and performance by Originator of this Agreement. There is no claim, action, litigation or proceeding before any court, governmental body or agency pending or threatened against Originator or, to the knowledge of Originator, pending or threatened against any lessee, guarantor, or equipment except as disclosed in writing to the Bank prior to the funding of any financing transaction.

J) Originator warrants and represents that it has no agreements or arrangements with any vendor or supplier for undisclosed discounts, payments or kickbacks made by the vendor or supplier either to a lessee, borrower, or Originator with respect to any financing transaction submitted to the Bank.

1015430.1

K)        Unless otherwise disclosed in writing, any financing transaction shall not be the subject of a sale leaseback transaction.

L)        No lessee, guarantor, obligor, supplier, vendor or pledgor shall be in bankruptcy at the time of the submission of any financing transaction by Originator to Bank.

M)        Unless otherwise disclosed in writing all equipment to be leased or equipment to be pledged as collateral under a purchase money security interest shall be new and not used and is being acquired in connection with the financing transaction submitted to the Bank.



N)        Originator warrants and represents that Originator has sourced each financing transaction directly ~~and has not~~ or from a re-brokered or super-brokered ~~any transaction unless disclosed in writing at the time of submission.~~ source. Originator agrees to stand behind the full representations and warranties as if it had originated each financing transaction directly.

All of the representations and warranties shall survive termination of this Agreement.

6.        **Compensation of Originator:**
For the duration of this Agreement, for each financing transaction approved and accepted by the Bank, Originator shall be entitled to the compensation at the Bank's then effective rates, which may be changed by the Bank at any time following thirty (30) days prior written notice to Originator. Originator acknowledges receipt of the rate structure in force and effect at the time any financing transaction is approved by the Bank.

7.        **Expenses of Originator:**
The Bank shall not be liable for any expenses whatsoever incurred by Originator in connection with any financing transaction submitted by Originator to the Bank.

8.        **Indemnity:**
Originator agrees to indemnify and hold the Bank harmless for any and all expenses, injury and damage, including reasonable attorney's fees, which the Bank may hereafter incur, pay or suffer as a result of Originator's acts or any breach of Originator's obligations, representations and warranties set forth herein or in any assignment from Originator to the Bank or in connection with any financing transaction, submitted to the Bank and with respect to any equipment or collateral which is part of a financing transaction submitted to the Bank. At Bank's request, not only will Originator indemnify and hold Bank harmless from any such damages but shall be required to defend Bank from any and all such claims, actions or causes of action at Originator's expense. The Bank shall have the right to approve counsel selected by Originator in connection with Originator's obligation to defend the Bank.

9.        **Right to Audit:**
The Bank shall have the right to enter upon Originator's business premises and inspect any files, computer or otherwise, associated with any financing transaction proposed or submitted, during normal business hours on 24 hours oral or written notice to Originator. Said inspection shall also serve to assure the Bank that Originator has complied with all of the terms of this Agreement.

10.        **Originator Recourse:**
The Bank and Originator agree that in the event a lessee or borrower defaults on a financing transaction in the first ninety (90) days from the funding date, then Originator will be required to remit all funds received by Originator from the Bank for the acquisition of the financing transaction within five (5) business days of the Bank's demand therefor. This provision is not intended as an election of remedies and, in addition to this provision of this Agreement, the Bank may pursue any and all of its rights and remedies to collect all of its damages against all persons or entities as a result of the default and any breach of this Agreement or otherwise.

1015430.1

Therefore, this provision of the Agreement is intended as cumulative and not the exclusive remedy of the Bank in the event of a breach of this Agreement or a default on the financing transaction.

11. **Remedies for Breach:**
Besides the obligation of the Originator to pay its commission to the Bank as set forth in paragraph 10 above, in the event of a breach of any of the representations and warranties set forth in paragraph 5, above, Originator, within five (5) business days of receipt of the Bank's written demand, shall purchase the identified financing transaction(s) from the Bank for a sum equal to the past due amounts, including taxes, late charges, and all other fees costs , plus the outstanding remaining payments and any residual value of the equipment in the case of a lease, discounted at a rate of five percent (5%). If Originator fails to remit said funds within five (5) days, the Bank shall have the option to suspend the Bank's performance of this Agreement, without waiving any rights or remedies available hereunder.
In the event of a material breach of this Agreement, the non-breaching party shall be entitled to immediately suspend performance of any and all of its obligations hereunder and shall provide the breaching party with written notice of the material breach and an opportunity to cure the material breach within ten (10) business days. Suspension of its obligations includes the obligations to pay commissions. Upon the cure of the material breach within ten (10) days, the non-breaching party shall perform as though the breach had not occurred. In the event the material breach is not cured within ten (10) business days, but is cured thereafter, the non-breaching party shall be excused of any performance that would have been required during the time of the default under this Agreement. The parties agree that all remedies contained in this Agreement are cumulative and not exclusive, and that both parties shall be entitled to exercise any and all rights afforded by applicable law in the event of a breach by the other party.

12. **Term of Agreement:**
This Agreement shall be effective upon execution hereof, shall govern all of the transactions between the parties, past, present and future, and shall continue in effect for a period of one (1) year, and shall remain in effect thereafter on a year to year basis until terminated by either party upon thirty (30) days written notice. The rights and obligations of the parties with respect to transactions originated prior to termination shall survive said termination.

13. **Notices:**
Notices required or convenient under this Agreement shall be sent to the following respective addresses, until changed by written notification to the other party of the change of address:

Banc of California, N.A.  
Attn: David Normandin  
18500 Von Karman, Suite 1100  
Irvine, CA 92612  
Facsimile: 949.777.6364

BSB Leasing, Inc.  
Attn: Donald Myerson  
1 Inverness Drive East  
Englewood, Co 80112  
Fax: 303-329-0240

14. **Construction and Interpretation:**
This Agreement shall be deemed to be entered into and made to be performed in the County of Orange, the State of California, and shall be governed by and construed in accordance with the laws of the State of California.

15. **Severability:**
In the event any provision of this Agreement shall be held to be invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

16. **Amendments and Modification:**
The terms and provisions of this Agreement shall not be waived altered, modified supplemented or amended in any manner whatsoever except by written instrument executed by the parties hereto. This Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and all oral and contemporaneous representations and agreements are merged herein. In addition, this Agreement may not be changed, amended or

1015430.1

altered by any course of dealing or performance of the parties unless there is a written amendment or agreement signed by the appropriate parties.

17.     **Attorney's Fees:**
Should it become necessary for either party to enforce this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and costs as determined by a court of competent jurisdiction, regardless of whether suit is initiated and regardless whether the enforcement of the terms of this Agreement occurs in State, Federal Bankruptcy or other court or any other judicial tribunal or administrative proceeding.

18.     **Venue:**
The parties hereby agree that in the event suit is initiated to enforce the terms and provisions of this Agreement, venue shall be proper in the County of Orange, State of California, and the parties consent to the jurisdiction of the Courts of Orange County, State of California. **Each party hereto knowingly, voluntarily and without undue coercion or duress specifically waives trial by jury. If for any reason this jury trial waiver is not effective, then on election by either party, they may proceed by judicial reference as set forth in California Code of Civil Procedure, Sections 638, et. seq.**

19.     **Confidentiality:**
Each party hereto agrees to (i) hold all information including customer lists, vendor lists, database information, pricing information, economic model, employee information, financial information, and policy and procedure information (collectively "Confidential and Proprietary Information") in strict confidence and agrees to take reasonable precautions to protect such Confidential and Proprietary Information, (ii) not to divulge any such Confidential and Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Confidential and Proprietary Information except in the course of this relationship, and (iv) not to copy, decompile, unscramble or reverse engineer any such Confidential and Proprietary Information. Any employee given access to any such Confidential and Proprietary Information must have a legitimate "need to know" and shall be deemed to be similarly bound. The parties agree that the foregoing clauses shall not apply with respect to any information that each can document (i) is or becomes generally available to the public, (ii) was in its possession or known by it prior to the receipt of same, (iii) was disclosed to it by a third party without restriction, or (iv) is independently developed without use of the other parties Confidential and Proprietary Information. In the event that the terms of this Agreement are the subject of discovery or subpoenaed, the subpoenaed party shall give the other party as much notice as possible and in no event less than 7 days so that the other party may proceed to obtain injunctive relief or a protective order if they deem it to be necessary. This provision may be specifically enforced and the parties agree that money damages will not necessarily compensate each other and any and all equitable relief is available for the parties to enforce this provision of the Agreement.

20.     **Counterparts; Signatures:**
This Agreement may be executed in counterpart with each counterpart being one and the same original document. This Agreement may be signed by facsimile or electronically and any such facsimile or electronic signature shall have the same force and effect as if it was an original ink signed document. Only authorized persons may sign this Agreement and unless the person signing this Agreement is at least a Vice President of the Bank and/or the Originator the Agreement will not be in force or effect. Further, any modification, extension, or amendment must also be signed by a Vice President or other authorized officer for it to be in force and effect.

Originator: BSB Leasing, Inc.                             BANC OF CALIFORNIA, N.A.

By: _____                              By: _____
Its:    President                                        Its:    Senior Vice President

1015430.1